The Quaker Oats Company, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent. Cereal Workers Local Union No. 221, AFL-CIO, Intervenor.

Argued February 1, 1982, before President Judge CRUMLISH and Judges CRAIG and MACPHAIL, sitting as a panel of three.

*Michael T. Welch,* with him *Norman I. White,* of *McNees, Wallace & Nurick,* for petitioner.

No appearance for respondent.

*Paul J. Dellasega,* with him *Ira H. Weinstock,* for intervenor.

OPINION BY JUDGE CRAIG, March 1, 1982:

The Quaker Oats Company appeals from the Unemployment Compensation Board of Review's order affirming the referee's award of benefits, for the weeks ending April 28, 1979 through May 26, 1979, to Frank D. Micelli, Charles J. Minnich and Leander D. Krist, three token claimants.[1] The referee concluded that the claimants' unemployment during that period, although related to a labor dispute, was the result of a lockout by the employer within the meaning of Section 402 (d) of the Unemployment Compensation Law.[2]

The collective bargaining agreements between the company and the claimants' union had expired on April 1, 1979, after numerous unsuccessful negotiation sessions. The following day, the parties signed an interim agreement stating that the plant would remain open under the terms and conditions of the expired agreements, and that, until a new contract was negotiated, the union would not strike and the company would not institute a lockout without twenty-four hours written notice.

---

[1] The token claimants represent 155 other similarly situated employees of Quaker Oats Company, who are members of the Cereal Workers Union, Directly Affiliated with Local Union 221, AFL-CIO.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), which provides that an employee is ineligible for compensation for any week:

    (d)    In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed....

Negotiations continued, but in late April, 1979, the company alleged that incidents of sabotage had occurred in the plant, and that the employees had begun to engage in a concerted work slowdown and a refusal to volunteer to work overtime shifts.

On April 26, 1979, the company announced its intention to shut down the plant, and rejected the union's subsequent offer to continue to work, responding that, "[a]t this time we have no reason to expect that normal operations could be resumed should the plant be reopened."

The central issue in this case is whether, before the company's lockout, the claimants were the first party to breach the terms and conditions of the prior collective bargaining agreement by engaging in acts of sabotage, participating in a production slowdown, and refusing to work overtime. *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968).

The referee's decision, which recited his conclusion that the work stoppage was caused by the company, regrettably lacks findings of fact needed to apply the legal principles which govern.

The referee made only one finding of fact dealing with the question of sabotage and work slowdown or refusal, as alleged by the company:

9. The employer contended the employees' sabotage was related to mechanical difficulties in the various machines, and that an alleged concerted refusal to work overtime contributed largely to a decline in production.

The recitation of contentions is not a finding as to the facts claimed. The referee must make a determination, based on the evidence, of the factual basis upon which the case is to be decided.

The parties' stipulation of facts[3] addresses the issue. The parties stipulated that: (1) the production efficiency rate of the plant was 82% between July, 1978 and March, 1979 and declined to 50% between April 16, 1979 and April 26, 1979; (2) the rate of overtime refusal was 30.3% before the strike, 98% during the week of April 16, 1979, and 100% on April 26, 1979; (3) all 27 mechanics who had agreed to work on Saturday, April 21, 1979 later told their supervisors that they wished to be excused, and all unscheduled mechanics contacted by the company refused to work that Saturday; (4) all 73 employees asked by the company to work overtime on April 26, 1979 refused, and the 43 with the lowest seniority were given three-day suspensions that were later reduced to warnings.

The only approximation of a finding is located in the referee's discussion. The referee stated:

[T]here was insufficient evidence to prove the employer's charges. No arrests or specific charges were directed at any of the employees involved in the work stoppage relative to the alleged acts of sabotage on the part of the employees. Although there was a new policy instituted to discipline employees refusing to work overtime, i.e., suspension for 3 days, the suspensions imposed on 43 employees were reduced to warnings when the plant reopened.

The fact that the company made no arrests or specific charges relating to its sabotage claim could indicate only that no employee was identified. We need a clear finding as to whether the alleged acts did occur, and,

---

[3] The stipulations included in the record were not signed by claimant's counsel. However, counsel adopts the stipulations in his brief.

if so, whether the claimants, either individually or as a group, were responsible.[4]

Furthermore, a discussion statement, that suspensions imposed on 43 employees for refusing to work overtime were reduced to warnings, does not constitute a finding as to whether or not the claimants, by refusing to work overtime, engaged in activity contrary to the provisions of the expired collective bargaining agreement which continued to be in effect.[5]

Moreover, the referee, in believing that he must "ascertain final cause or responsibility for the work stoppage," may have been misled as to the appropriate standard for determining which party is responsible for a work stoppage under Section 402(d).

The general test to be applied in determining whether a work stoppage is a strike or a lockout is that which the Supreme Court articulated in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 444-45, 163 A.2d 91, 93-94 (1960).[6]

---

[4] Section 402(d) "is quite clear in providing that when a work stoppage is the result of a labor dispute, a claimant who is a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage is ineligible for unemployment compensation benefits." *Unemployment Compensation Board of Review v. Fox Grocery Co.*, 25 Pa. Commonwealth Ct. 494, 495, 360 A.2d 248, 249 (1976).

[5] The following provisions of the expired collective bargaining agreement are pertinent:

The union agrees that during the terms of this agreement there will be no strike of any kind nor concerted slowdown or work stoppage. [Section 2.01]

....

No employee shall participate in any strike, concerted slowdown or work stoppage during the terms of this agreement. [Section 2.03].

[6] The Supreme Court stated the test as follows:

Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pend-

The test was refined by the Supreme Court in *Philco*, 430 Pa. at 103-04, 242 A.2d at 455, stating: .

> Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lockout requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

The *Philco* test has been adopted by our court in numerous instances.[7] *See, e.g., Centennial School District v. Unemployment Compensation Board of Review*, 56 Pa. Commonwealth Ct. 86, 424 A.2d 569 (1981); *Loftus v. Unemployment Compensation Board of Review*, 54 Pa. Commonwealth Ct. 271, 420 A.2d 1351 (1980).

Thus the referee must ascertain the factual circumstances leading to the company's lockout. If the referee finds that the claimants, individually or collec-

---

ing the final settlement of contract negotiations; has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refused to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

[7] The determination of which side, union or management, first refused to continue operations under the status quo is so crucial that this court has refused to adopt a de minimis rule allowing a party to alter the status quo even slightly. *See Chichester School District v. Unemployment Compensation Board of Review*, 53 Pa. Commonwealth Ct. 74, 415 A.2d 997 (1980).

tively, "first refused to continue operations under the status quo after the contract had technically expired,"[8] he must find claimants ineligible for benefits.[9]

---

[8] The referee indicated that he must "ascertain final cause or responsibility for the work stoppage." However, the company asserts that the proper standard is the test espoused in *Philco*, requiring a determination of which party "first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." These judicial perspectives of the same matter offer seemingly contradictory standards to determine which party, union or management, is responsible for a work stoppage. A review of the history of the "final cause" test indicates that the tests need not be construed in a contradictory manner, because the "final cause" standard should be viewed in a limited sense.

The "final cause" standard was created in *Hogan Unemployment Compensation Case*, 169 Pa. Superior Ct. 554, 83 A.2d 386 (1951). There the employer, after unsuccessful negotiations, offered to furnish work to its employees under the same terms and conditions that existed under the expired contract. The court said:

> The negotiations are relevant to show the history of the negotiations and the attitude of the parties, but the ultimate and crucial question is: *What* occurred *after* negotiations ceased, or failed to produce an agreement, and *what* and who *caused* the work stoppage?
>
> ....
>
> 'The Board properly concluded that the *final cause* of the work stoppage was the refusal of the union members to work without a contract.' (Emphasis in original.)

169 Pa. Superior Ct. at 562, 83 A.2d at 391.

*Hogan* reflected judicial reluctance to consider the substance of negotiations between management and labor. Once a collective bargaining agreement has expired, the court is concerned only with which party refused to comply with the provisions of the old agreement.

Claimants, relying on two cases, *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960) and *Small Tube Products, Inc. v. Unemployment Compensation Board of Review*, 198 Pa. Superior Ct. 308, 181 A.2d 854 (1962), suggest that the "final cause" standard mandates a finding that the company is responsible for the work stoppage, because the "[c]ompany's act of closing the plant was unquestionably the *final act* causing the work

Accordingly, we reverse the order of the board and remand for findings of fact and application of the legal standards discussed in this opinion.

ORDER

Now, March 1, 1982, the order of the Unemployment Compensation Board of Review, dated April 29, 1980, is reversed and the case is remanded for findings of fact and application of the standards of law discussed in the opinion.

———

stoppage." (Emphasis in original.) However, both of these cases, like *Hogan*, involved situations where the court expressed a disinterest in the nature of the labor negotiations, and was concerned merely with which party refused to maintain the status quo.

The present case does not involve a situation of negotiations and one party's refusal to comply with the status quo; rather it involves the history after negotiations had failed and the parties were forced to continue under an expired contract. Given this situation, requiring an analysis of an alleged production slowdown or concerted refusal to work overtime and the company's subsequent lockout, a standard of "final cause" may confuse the determination of which party first refused to comply with the status quo.

[9] "If fault of a work stoppage is attributable to both employer and employees, compensation must be denied. The purpose of the Compensation law was to benefit faultless employees." *Toma v. Unemployment Compensation Board of Review*, 4 Pa. Commonwealth Ct. 38, 43, 285 A.2d 201, 205 (1971).