547 A.2d 841

Teledyne Vasco, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued March 21, 1988, before Judges BARRY and McGINLEY, and Senior Judge KALISH, sitting as a panel of three.

584

*Peter D. Post, Reed, Smith, Shaw & McClay,* for petitioner.

No appearance for respondent.

*Richard E. Gordon, Grossinger & Gordon,* for intervenors, Thomas Eckhardt and Thomas Zinkham.

OPINION BY JUDGE MCGINLEY, September 20, 1988:
Teledyne Vasco (Teledyne) appeals a decision of the Unemployment Compensation Board of Review (Board), affirming a referee's decision granting unemployment compensation benefits to claimants Thomas Eckhardt and Thomas Linkham (lead tokens), Intervenors in this appeal, and other union employees of Teledyne. We affirm.

The facts, as found by the referee and adopted by the Board, are as follows:

3. Members of the Union were employed at the employer's Monaca, Pennsylvania facility which is commonly known as the Colonial Plant.

4. Originally, a three-year labor-management agreement, effective November 1, 1980, cover-

ing the terms and conditions of employment of the union members was scheduled to expire on October 31, 1983.

5. Effective July 3, 1983, by means of an addendum to the November 1, 1980, agreement, the same was extended for three additional years and the prior three-year labor-management agreement along with the addendum became the labor-management agreement through October 31, 1986.

6. The July 3, 1983 addendum contained certain concessions on behalf of the bargaining unit employees regarding holidays, vacations and COLA.

7. In accordance with the terms of the addendum, these concessions were to be restored to their original level effective October 31, 1986.

8. Employer and union representatives commenced negotiations on October 7, 1986, in an attempt to arrive at a new labor-management agreement prior to the expiration of the existing agreement at midnight on October 31, 1986.

9. Despite several negotiating sessions, no new labor-management agreement had been reached as of October 29, 1986.

10. At the negotiating session held on October 29, 1986, the union offered to continue working on and after October 31, 1986, under the terms and conditions of the labor-management agreement scheduled to expire on that date while negotiations continued.

11. The employer offered a counter proposal which provided that work would continue under the terms and conditions of the 1983-1986 Collective Bargaining Agreement until November 23, 1986 except that the addendum restoration

items would not be effective until November 23, 1986.

12.   The union accepted the employer's counter-proposal.

13.   During this extension period, negotiations continued but the parties were still unable to agree on a new labor-management agreement.

14.   At the negotiating session held on November 18, 1986, the employer requested a further extension until December 14, 1986.

15.   On November 21, 1986, the employer and the union entered into an agreement which provided that work would continue under the terms and condtions of the expired labor-management agreement until midnight on December 14, 1986 except that the addendum restoration items would not go into effect until December 14, 1986.

16.   During this second extension period, all efforts between the parties to reach a new labor-management agreement proved unsuccessful.

17.   At the final negotiating session held on December 12, 1986, once again the union offered to continue working on and after December 14, 1986, under the terms and conditions of the expired agreement while negotiation efforts to reach a new agreement continued.

18.   This offer was not acceptable to the employer and was rejected and the employer at the negotiating session informed the union that subsequent to midnight on December 14, 1986, work would be available but only under the terms and conditions of the employer's final proposal of December 8, 1986 which called for wage reductions and other concessions which were not agreeable to the union.

19. On and after December 12, 1986, the employer did not offer the union a counter proposal which would permit work to continue beyond December 14, 1986 under the terms and conditions of the expired agreement with the exception of the restoration items contained in the July 3, 1983, addendum.

20. The employer would only permit work to continue on and after December 15, 1986, under the terms and conditions unilaterally established by the employer in what was designated as the employer's final proposal of December 8, 1986.

21. The employer's offer was unacceptable to the union and its membership and picket lines were established after midnight on December 15, 1986, and continued to be maintained thereafter by members of the union.

Our scope of review is limited to a determination of whether the Board committed an error of law or whether the Board's findings of fact are supported by substantial evidence. *Wertman v. Unemployment Compensation Board of Review,* 103 Pa. Commonwealth Ct. 376, 520 A.2d 900 (1987). However, because the question of whether a work stoppage was the result of a strike or lockout for the purposes of determining unemployment compensation benefits is a mixed question of law and fact, *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), "the appellate court must make an independent determination." *Norwin School District v. Unemployment Compensation Board of Review (Belan),* 510 Pa. 255, 264, 507 A.2d 373, 378 (1986).

Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex. Sess.,

P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), provides:

> An employe shall be ineligible for compensation for any week—
>
> . . . .
>
> (d) In which his unemployment is due to a *stoppage of work, which exists because of a labor dispute (other than a lock-out)* at the factory, establishment or other premises at which he is or was last employed. . . . (Emphasis added.)

In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960), the Pennsylvania Supreme Court established the test for determining whether a work stoppage is the result of a strike or lockout:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses so to extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout'. . . .

*Id.* at 444-45, 163 A.2d at 93-94.

Teledyne argues the union did not offer to continue working for a reasonable time; the union did not offer to continue working under pre-existing terms and conditions of employment; and that, Teledyne did extend pre-existing conditions of employment for a reasonable time after the expiration of the 1983-1986 agreement.

Teledyne argues the union's offer to continue working in this case was not limited to a reasonable time. The union and Teledyne twice agreed to an extension of

the labor management agreement, the first expiring November 23, 1986, and the second December 14, 1986. Teledyne conditioned its acceptance of both extensions on delaying the effective dates of the July 1, 1983, Addendum restoration items (Addendum).[1] The union ini-

---

[1] As noted in Findings of Fact Nos. 6 and 7 this Addendum contained concessions on behalf of the bargaining unit employees regarding holidays, vacations and COLA which were to be effective July 1, 1983 through October 31, 1986. On October 31, 1986, these items were to be restored to their original level. The Addendum included:

3. *Holidays (Section V)*
(a.) Effective starting in 1983, Christmas Day is eliminated as a paid holiday.
(b.) Effective starting in 1984, Friday before Labor Day is eliminated as a paid holiday.
4. *Vacations (Section VI)*
(a.) Effective immediately the Weekly Vacation Bonus is eliminated.
(b.) Effective in 1983 the Extra Vacation Day is eliminated.
(c.) Effective in January 1, 1984, the Extra Vacation Program is eliminated.
(d.) Effective January 1, 1984, Pay-in-lieu of Vacation is eliminated.
5. *Cost-of-Living Adjustment (C.O.L.A.) (Section 111)*
(a.) The ten cents per hour COLA add-on currently in effect is eliminated as of July 3, 1983.
(b.) Effective July 3, 1983, COLA is deleted for the duration of this agreement.
6. *Work Week (section IV)*
Effective July 3, 1983, and until June 1, 1984, for those employees scheduled to work, the work week shall be on a 5-day basis rather than 4-days.
8. *Restoration*
The above listed deletions in the Holidays, Vacations and COLA programs will be reinstated effective October 31, 1986 and all other items shall be deleted effective October 31, 1986.
Claimants' Exhibit No. 2.

tiated both extensions by its offer to continue working under the terms and conditions of the existing contract while negotiations for a new contract continued. Both contract extension agreements were preceded by letters from the union. A third letter dated December 12, 1986, requested, in language identical to the prior letters, a further extension under the existing contract while negotiations continued (Notes of Testimony, February 19, 1987, (N.T.) at 23-31 and Claimants' Exhibit No. 6). As in the two previous letters the offer of December 12 did not request implementation of the Addendum. At the December 12, 1986, meeting Teledyne rejected the union's offer to continue working under the existing contract and informed the union that commencing December 14, 1986, work would be available only under the terms and conditions of Teledyne's final proposal of December 8, 1986.

Teledyne cites *Bedow v. Unemployment Compensation Board of Review*, 97 Pa. Commonwealth Ct. 192, 510 A.2d 152 (1986) in which this Court explained that a long-term offer to continue work under the terms of an expired labor contract was not reasonable as it deprived the employer of the opportunity to negotiate for present relief from the old contract. *Bedow* is distinguishable. In that case our Court concluded that the union's offer to continue working under the expired contract was in actuality an offer to continue working for another three year term. Here, Teledyne, on December 12 and 15, 1986, indicated an unwillingness to continue the status quo. The union's proposal of December 12, 1986, expressed a desire to continue working under the terms and conditions of the 1983-1986 Agreement, and a willingness to continue to negotiate.[2]

---

[2] The union's request of December 12, 1986, "to continue working on and after December 14, 1986, under the terms and conditions of the 1983-1986 agreement pending the parties' contin-

Teledyne further argues that the union did not offer to continue work for a reasonable time because the union's December 12, 1986 offer provided that the union would continue working subject to a 48-hour strike notice.[3] Teledyne cites *Hershey Estates v. Unemployment Compensation Board of Review*, 400 Pa. 446, 163 A.2d 535 (1960). In that case, the Pennsylvania Supreme Court concluded that the union's offer to continue working under the expired contract on a day-to-day basis was not an offer to continue working for a "reasonable time," because the employer, Hershey Estates, "consist[ed] mainly of service industries, *i.e.*, a hotel, laundry, department store, community inn, etc.", and that the "nature of these industries is such that it would be almost impossible to operate them adequately on a day to day basis." *Id*. at 451, 163 A.2d at 537. Teledyne is engaged in manufacturing and is not a service industry. Moreover, the union's proposal providing for a 48-hour notice was reasonable insofar as its purpose was to enable the union and Teledyne's representatives to meet and make arrangements for an orderly and safe shutdown.

Teledyne's second argument is that the union did not offer to continue working under pre-existing terms and conditions of employment. We disagree.

uing efforts to negotiate a new agreement" was not a long-term offer, but an offer to continue the status quo during negotiations (N.T. at 30-31, Claimants' Exhibit No. 6).

[3] The union stated:

If the Company accepts this proposal and the Union should later decide to strike, the Union will provide the Company with 48 hours notice of its intent to strike. We propose to use the 48 hour period for the purpose of meeting with the Company representatives to assure that arrangements are in place for an orderly and safe shutdown of the Company's facility.

Claimants' Exhibit No. 6.

For more than a three year period, from July 3, 1983, through October 31, 1986, the union was in a "giveback" situation. Through an Addendum to the original labor-management agreement effective November 1, 1980, the union agreed to wage and benefit concessions. The Addendum included the restoration of COLA, holidays, and vacation benefits as stated in Footnote 1 herein. The restoration of these benefits was scheduled to be implemented on November 1, 1986, as part of the existing labor agreement. Nevertheless, in order to preserve employment while negotiations continued, the union agreed in both contract extensions to delay the implementation of the items. Again on December 12, 1986, the union offered to maintain the status quo while negotiations continued. Teledyne asserts that the union demanded restoration of benefits in the Addendum. The record indicates the union did not demand the immediate implementation of the benefit restoration items (N.T. at 18, 23, 26 and 31). As noted, subsequent to October 31, 1986, the union twice agreed to forego the Addendum benefits it had already bargained for in the prior labor agreement (Claimants' Exhibits Nos. 1 & 2). Our Supreme Court has held that an employer's refusal to pay fringe benefits bargained for in a labor contract constitutes a departure from the status quo. Any preconditions the employer sets to restore the status quo that are not part of the pre-existing labor agreement results in a lockout under Section 402(d) of the Law. *Norwin School District v. Unemployment Compensation Board of Review*, 510 Pa. 255, 507 A.2d 373 (1986). Teledyne first altered the status quo when it informed the union that subsequent to midnight, December 14, 1986, work would be available only under the terms and conditions of Teledyne's final proposal of December 8, 1986.

Finally, Teledyne argues that it met its obligation to maintain the status quo by agreeing to two contract extensions and that a bargaining impasse had been reached. A bargaining impasse occurs where the parties have exhausted the prospect of concluding an agreement and further negotiations would be fruitless. *Id*. Teledyne acknowledges that the parties had *not* exhausted fruitful negotiations:

> There is no evidence in the record that Vasco representative ever said that the offer of December 12, 1986 was a last or final offer. In fact, bargaining continued after the work stoppage and both sides made new offers, ultimately agreeing on a new contract. There is no evidence in the record that during the work stoppage Vasco attempted to hire replacement employees on the basis of an unilaterally implemented final offer; in fact, Vasco did not hire any replacements.

Petitioner's Brief at 26. The Board was not persuaded that negotiations between the union and Teledyne had reached an impasse and that economic loss caused was the reason for Teledyne's unilateral implementation of its final offer. We agree that the record fails to support Teledyne's argument of impasse and economic loss. In reviewing a determination of the Board, our Court must give every reasonable inference to the party in whose favor the Board has found. *Philco*. Giving every inference to the claimants Teledyne altered the status quo prior to exhaustion of fruitful negotiations.[4]

We conclude that, under the particular circumstances of this case, the union's offer to continue work-

---

[4] Teledyne defends its refusal to continue the status quo while negotiations continued on the basis of economic necessity. However, the Board has not erred for there is substantial evidence to support the Board's conclusion that Teledyne's parent corporation, Teledyne, Inc., was in good financial condition (N.T. at 40-41).

594

ing under the old contract constituted an offer to continue working for a "reasonable time." Teledyne's refusal to accept the offer and its unilateral implementation of its December 8, 1986 proposal, altered the status quo and thus, rendered this work stoppage a "lockout." *Vrotney.*

Accordingly, we affirm the Board's award of benefits.

ORDER

AND NOW, September 20, 1988, the orders of the Pennsylvania Unemployment Compensation Board of Review at Decision No. B-258490 and B-258491, both dated May 29, 1987, are hereby affirmed.